**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MILTON GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No.: 4:19-cv-01563 |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| AND OFFICER CHRISTOPHER | ) | JURY TRIAL DEMANDED |
| TANNER, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

On June 21, 2017, Defendant Officer Christopher Tanner of the St. Louis Metropolitan Police Department shot and seriously wounded Plaintiff Milton Green, an off-duty officer from the same department. Defendant Tanner violated Officer Green's rights under the Fourth and Fourteenth Amendments by unreasonably seizing him and using excessive force against him, leaving Officer Green permanently disabled and incapable of returning to duty. The City of St. Louis, Missouri, ratified Defendant Tanner's unconstitutional conduct through its custom of unreasonable seizures and excessive force and its failure to train and supervise its officers.

## JURISDICTION AND VENUE

1.     Plaintiff brings this Complaint pursuant to 42 U.S.C. § 1983 and the Fourth Amendment, as incorporated against the states and their municipal divisions through the Fourteenth Amendment.

2.     The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Officer Green's action arises under the United States Constitution and § 1343(a)(3) to redress the deprivation of rights secured by the United States Constitution.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis, and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.      This Court has supplemental jurisdiction over the included Missouri state law claims, pursuant to 28 U.S.C. §1367.

6.      Plaintiff demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b).

## **PARTIES**

7.      Officer Green is a United States citizen and a resident of the City of St. Louis, Missouri.

8.      Defendant City of St. Louis, Missouri (hereinafter, "Defendant City") is a first-class city and a political subdivision of the State of Missouri, duly organized under the Constitution of Missouri.

9.      The Public Facilities Protection Corporation insures Defendant City.

10.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of Defendant City, organized and controlled pursuant to Missouri law.

11.      Defendant Tanner is a sworn peace officer employed by Defendant City. All actions of Defendant Tanner set forth in this Complaint were done under the color of law. Defendant Tanner is sued in his individual capacity.

## FACTS

12.      Officer Green has been an SLMPD officer since 2005. At the time of the shooting, Officer Green was a Community Resource Officer. He was on the list to become a sergeant having already passed the sergeant's exam.

13.     On June 21, 2017, Officer Green was off duty and working on a car owned by his friend and neighbor, in their shared driveway.

14.     Late that evening, Officer Green heard the sounds of a loud engine on his street. The vehicle ("Vehicle 1") attempted to make a right turn and crashed into a car. Vehicle 1 stopped in front of Officer Green's house.

15.     Officer Green then heard a screeching sound and noticed a second car, a black sedan with tinted windows, ("Vehicle 2") at the intersection of Park Lane and Astra Avenue.

16.     Fearing that a gang shooting might be afoot, Officer Green ducked behind his friend's car. Officer Green watched the driver and passengers of Vehicle 1 take off on foot.

17.     One of the occupants of Vehicle 1 ran north through Officer Green and his friend's gangway ("Occupant 1").

18.     SLMPD officers wearing bulletproof vests got out of Vehicle 2. At least one SLMPD officer chased Occupant 1, shouting, "Drop your gun!"

19.     Officer Green then heard the sounds of gunfire.

20.     Another occupant of Vehicle 1 ran towards the east side of Officer Green's house ("Occupant 2").

21.     When the shots were fired, Occupant 2 dropped to the ground, but he stood back up after the SLMPD officer ceased firing. After checking himself for injuries, Occupant 2 picked up his gun.

22.     Officer Green's friend yelled that Occupant 2 had a gun.

23.     In response, Occupant 2 turned towards Officer Green and his friend, pointing his gun at them. Officer Green drew his service weapon and yelled, "Police! Drop your gun!"

24.     Occupant 2 then took off running east again, through Officer Green's yard.

25.     As Officer Green moved to follow, an SLMPD officer told Officer Green to drop his weapon and get on the ground. Officer Green complied.

26.     Occupant 2, an armed criminal suspect, got away.

27.     Although Officer Green explained that he was police, the officer told him to "shut the hell up and stay on the ground."

28.     Bizarrely, the SLMPD officer did not search or handcuff Officer Green. Instead, the officer just walked away.

29.     Officer Green saw another SLMPD officer, Detective Brett Carlson, handcuffing his friend. Officer Green spoke to Detective Carlson and showed his badge. Detective Carlson told his fellow officers that Officer Green was police and specifically directed them not to shoot Officer Green.

30.     Thereafter, Detective Carlson told Officer Green to approach him.

31.     Officer Green stood, took three steps to secure his weapon, picked it up, and started walking towards Detective Carlson, badge in hand.

32.     Officer Green carried his gun in his right hand, with the barrel pointed at the ground.

33.     While Officer Green was giving Detective Carlson a description of Occupant 2, Officer Green saw two SLMPD officers in his peripheral.

34.     One of the officers, Defendant Tanner, shouted, "Drop your weapon!" and *simultaneously* shot Officer Green without allowing Officer Green any time to respond.

4

35.     Officer Green posed no danger to officer or public safety. He had committed no crimes. He was a police officer aiding in efforts to apprehend an armed suspect.

36.     Defendant Tanner shot Officer Green in the arm without cause or adequate warning.

37.     Detective Carlson yelled, "I told you he was off duty. I told you not to shoot."

38.     Defendant Tanner stood silent, offering no aid or apology for such an egregious transgression.

39.     Had Defendant Tanner exercised due care, he would have noticed that Officer Green was calmly talking to Detective Carlson, with a badge in his hand, and that Detective Carlson had the situation under control.

40.     Officer Green did not immediately understand that he was wounded. Stunned, he looked down, saw blood on his body, and dropped to one knee. Detective Carlson called out "Officer down!"

41.     Officer Green was transported to Barnes-Jewish Hospital.

42.     Officer Green received eight x-rays and underwent emergency surgery to repair his shattered arm.

43.     He received approximately six months of physical therapy, but his arm is permanently damaged.

44.     Two years later, Officer Green is still on disability leave. He continues to struggle with tingling, pain, and weakness in his fingers and arm, which prevents him from grabbing and lifting things.

45.     For the last two years, Officer Green was also unable to coach football or basketball, activities that he is passionate about.

46.     Because of the financial loss directly caused by the shooting, Officer Green is

drowning in bills and his home is nearing foreclosure.

47.     Officer Green has three children, and his family is suffering as a result of Defendant Tanner's conduct.

48.     Officer Green's wife saw him get shot. Looking out of her window, his then-15-year-old daughter saw Officer Green lying on the ground bleeding.

49.     Officer Green's children required therapy to deal with the trauma of their father being shot by someone who was supposed to have his back, a fellow officer.

50.     Because Officer Green was out of work, his wife took extra jobs on top of having to take care of Officer Green and their children. Emotionally and physically spent, Mrs. Green eventually moved out.

51.     As a result of the shooting, Officer Green's marriage crumbled, and he is now divorced.

52.     Despite Defendant Tanner's grievous misconduct and the downward spiral it caused in Officer Green's life, SLMPD has not handled its investigation of Officer Green's shooting with any solemnity.

53.     Instead, SLMPD never interviewed Officer Green.

54.     Hardly impartial, the internal affairs investigator was the father of Defendant Tanner's partner.

55.     On information and belief, Defendant Tanner only faced administrative leave for shooting Officer Green.

56.     Officer Green, on the other hand, a 12-year veteran of the force, has been tossed aside by those he once considered his brothers.

57.     The racial implications of how Officer Green has been treated cannot be ignored.

Officer Green is African American, while Defendant Tanner is white.

58.     After Officer Green was shot, the St. Louis Police Officer's Association ("SLPOA"), the primary union for SLMPD officers, raised about $2,000 for Defendant Tanner. Tellingly, SLPOA held no fundraisers for Officer Green.

59.     In contrast, the SLPOA held a large fundraiser on June 25, 2019 for disgraced ex-SLMPD officer William Olsten. The fundraiser, which included free beer and food, was a watch party for the final game of the Stanley Cup Championship. All proceeds went to Olsten, a white officer currently under indictment for beating and shooting a man he had argued with in a bar and lying to police about what occurred. Olsten is also a defendant in a half dozen civil rights suits alleging that he used excessive force.

60.     Nearly two years later, Officer Green's pension claim has yet to be adjudicated.

61.     It is typical for SLMPD officers injured in the line of duty to quickly have their pension claims heard and granted. However, the process for Officer Green has dragged on.

62.     Remarkably, a pension board hearing scheduled for February was rescheduled because the SLMPD notified the board that it had a theretofore unknown second police report about the incident.

63.     SLMPD refused to provide a copy of the report to Officer Green or the board but, instead, insisted on continuing the hearing all the way to June 2019, to allow SLMPD to show the new report to the pension board and then take it back.

64.     It is entirely unclear why this process needed a four-month continuance.

65.     To this date, the pension board has not ruled on Officer Green's claim, and he continues to suffer needlessly in limbo.

## CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983 – Unreasonable Seizure**
**Fourth and Fourteenth Amendment Violation**
**(Against Defendant Tanner)**

66.     Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

67.     Defendant Tanner did not have probable cause to seize Officer Green.

68.     By shooting Officer Green, Defendant Tanner restrained Officer Green's freedom of movement.

69.     Defendant Tanner deprived Officer Green of his right to be free from unreasonable seizure of his person, in violation of the Fourth and Fourteenth Amendments.

70.     Defendant Tanner engaged in this unlawful action willfully and knowingly, acting with reckless or deliberate indifference to Officer Green's Fourth Amendment rights.

71.     As a direct and proximate cause of Defendant Tanner's unlawful actions, Officer Green suffered damages, including physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for his own safety.

72.     At all times, Defendant Tanner acted under color of state law.

73.     If Officer Green prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

### COUNT II
**42 U.S.C. § 1983 – Excessive Force**
**Fourth and Fourteenth Amendment Violation**
**(Against Defendant Tanner)**

74.     Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

75.     Officer Green had committed no criminal acts, nor was he a danger to officer or public safety.

76.     Yet, Defendant Tanner shot Officer Green, subjecting him to unconstitutional, deadly force, in violation of the Fourth and Fourteenth Amendments.

77.     Defendant Tanner engaged in this unlawful action willfully and knowingly, acting with reckless or deliberate indifference to Officer Green's Fourth and Fourteenth Amendment rights.

78.     As a direct and proximate cause of Defendant Tanner's unlawful actions, Officer Green suffered damages, including physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for his own safety.

79.     At all times, Defendant Tanner acted under color of state law.

80.     If Officer Green prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

### COUNT III
### 42 U.S.C. § 1983 – Municipal Liability
### *Monell* Claim by All Plaintiffs against Defendant City for Customs of Unreasonable Seizures and Excessive and Failures to Train and Supervise

81.     Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

82.     Defendant City is liable for harms Defendant Tanner's constitutional violations inflicted on Officer Green, because the violations were caused by Defendant City's custom of unreasonably seizing law-abiding citizens. *See Taylor ex rel. Taylor v. Isom*, 4:11-CV-1351 CAS, 2013 WL 1867106, at *1 (E.D. Mo. May 2, 2013). *See also O'Rourke v. King*, 4:16-CV-01795 AGF, 2017 WL 1152120, at *1 (E.D. Mo. Mar. 28, 2017).

83.     Defendant City is also liable for harms Defendant Tanner's constitutional violations

inflicted on Officer Green, because the violations were caused by Defendant City's custom of using excessive force on law-abiding citizens. *See Taylor*, 2013 WL 1867106, at *1. *See also O'Rourke*, 2017 WL 1152120, at *1; *Templeton v. Dotson*, No. 4:14-cv-02019, ECF No. 12 (E.D. Mo. Dec. 11, 2014) at 2; *Fletcher v. Tomlinson*, 895 F.3d 1010, 1017 (8th Cir. 2018).

84.     Defendant City had notice that its training and supervision was inadequate and likely to result in constitutional violations based on multiple incidents of officers unconstitutionally seizing and using excessive force on law-abiding citizens, as referenced above.

85.     In its failures, Defendant City has been deliberately indifferent to the rights of its residents, and those failures and customs are the moving force behind, and direct and proximate cause of, the constitutional violations Officer Green suffered.

86.     As a direct result of Defendant City's customs and failures, Officer Green suffered damages, including physical injury, fear, apprehension, and concern for his own safety.

87.     If Officer Green prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

## COUNT IV
### Missouri Law – Battery
### (Against All Defendants)

88.     Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

89.     By shooting Officer Green without probable cause, Defendant Tanner intentionally subjected Officer Green to harmful and offensive contact.

90.     As a result of Defendant Tanner's conduct, Officer Green suffered damages, including physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and great concern for his own safety.

91.    Defendant City is self-insured by the Public Facilities Protection Corporation ("PFPC"). The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

92.    Moreover, the PFPC was designed to "insure the City against all claims." Exh. 1, Correspondence from Julian Bush, City Counselor.

93.    By possessing such self-insurance, Defendant City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

94.    Defendant City has waived sovereign immunity, pursuant to § 537.610.1, RSMo.

95.    Defendant Tanner' actions were carried out in bad faith or malice, such that punitive damages should be awarded to punish Defendants, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

### COUNT V
### Missouri Law - Negligent Infliction of Emotional Distress
### (Against All Defendants)

96.    Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

97.    Defendant Tanner had a legal duty to protect Officer Green from injury, and Defendant Tanner breached his duty by unconstitutionally seizing Officer Green and subjecting him to deadly force.

98.    This breach was the proximate cause of damage to Officer Green.

99.    Defendant Tanner should have realized that his conduct involved an unreasonable

risk of causing distress.

100.     Defendant Tanner's action caused Officer Green to reasonably fear for his own person and suffer emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendant Tanner's actions.

101.     Defendant City is self-insured by the Public Facilities Protection Corporation ("PFPC"). The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

102.     Moreover, the PFPC was designed to "insure the City against all claims." Exh. 1.

103.     By possessing such self-insurance, Defendant City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

104.     Defendant City has waived sovereign immunity, pursuant to § 537.610.1, RSMo.

105.     Defendant Tanner' actions were carried out in bad faith or malice, such that punitive damages should be awarded to punish Defendants, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff prays for judgment against all Defendants for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: June 17, 2019     Respectfully submitted,

             KHAZAELI WYRSCH LLC

             /s/ Javad M. Khazaeli
             Javad M. Khazaeli, 53735MO
             James R. Wyrsch, 53197MO
             Kiara N. Drake, 67129MO
             911 Washington Avenue, Suite 211
             Saint Louis, MO 63101
             (314) 288-0777
             (314) 400-7701 (fax)
             javad.khazaeli@kwlawstl.com
             james.wyrsch@kwlawstl.com
             kiara.drake@kwlawstl.com

             *Attorneys for Plaintiff*