**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MILTON GREEN, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 4:19 CV 1711 DDN |
| CITY OF ST. LOUIS and OFFICER CHRISTOPHER TANNER, | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Before the Court is the joint motion of defendants City of St. Louis (defendant "City") and Officer Christopher Tanner to dismiss all counts of plaintiff Milton Green's complaint (Doc. 1) under Federal Rule of Civil Procedure 12(b)(6). (Doc. 22.)

**BACKGROUND**

In his complaint plaintiff Green alleges the following. On June 21, 2017, when off-duty as a St. Louis Metropolitan Police Officer, he was shot and seriously wounded by defendant Christopher Tanner, a fellow St. Louis Metropolitan Police Officer. Plaintiff alleges defendant Tanner violated plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and the use of excessive force. Plaintiff also alleges that defendant City of St. Louis ratified Tanner's unconstitutional conduct through a "custom of unreasonable seizures and excessive force and its failure to train and supervise its officers." (Doc. 1 at 1.)

More specifically, plaintiff Green alleges that late in the evening on June 21, 2017, while off-duty at home and working with his neighbor outside on his neighbor's car, another vehicle came careening and crashed into another car with the driven vehicle stopping in front of Green's home. Green noticed another vehicle following the first making a screeching sound and feared that a gang shooting might be involved. Green ducked down and watched the driver of the first vehicle get out and run through the gangway between his and his neighbor's homes. From the second vehicle came at least one St. Louis Metropolitan Police Officer who shouted at the running driver to drop his gun. Green then heard gunfire. A second occupant of the first vehicle got out

of the vehicle and ran towards Green's house. Shots were fired and the second occupant dropped to the ground, but stood up when the gunfire stopped and picked up his weapon. Green's neighbor yelled that the second occupant had a gun. With that, the second occupant turned toward Green and his neighbor and pointed his gun at them. Green then drew his own service weapon and ordered the second occupant to drop his gun. The second occupant then ran off between the houses and into Green's backyard.

Plaintiff Green further alleges that one of the pursing officers told him to drop his weapon and get on the ground. Green complied. Although Green said he was a St. Louis police officer, the officer told him to shut up and stay on the ground. Then the officer walked away from Green without securing him. Plaintiff Green further alleges that then,

> 29. Officer Green saw another SLMPD officer, Detective Brett Carlson, handcuffing his friend. Officer Green spoke to Detective Carlson and showed his badge. Detective Carlson told his fellow officers that Officer Green was police and specifically directed them not to shoot Officer Green.
>
> 30. Detective Carlson told Officer Green to approach him.
>
> 31. Officer Green stood, took three steps to secure his weapon, picked it up, and started walking towards Detective Carlson, badge in hand.
>
> 32. Officer Green carried his gun in his right hand, with the barrel pointed at the ground.
>
> 33. While Officer Green was giving Detective Carlson a description of Occupant 2, Officer Green saw two SLMPD officers in his peripheral.
>
> 34. One of the officers Defendant Tanner, shouted, "Drop your weapon!" and *simultaneously* shot Officer Green without allowing Officer Green any time to respond.
>
> 35. Officer Green posed no danger to officer or public safety. He had committed no crimes. He was a police officer aiding in efforts to apprehend an armed subject.
>
> 36. Defendant Tanner shot Officer Green in the arm without cause of adequate warning.
>
> 37. Detective Carlson yelled, "I told you he was off duty. I told you not to shoot."

> 38. Defendant Tanner stood silent, offering no aid or apology for such an egregious transgression.
>
> 39. Had Defendant Tanner exercised due care, he would have noticed that Officer Green was calmly talking to Detective Carlson, with a badge in his hand, and that Detective Carlson had the situation under control.

(Doc. 1 at 4-5.)

Plaintiff Green further alleges that Tanner's shot seriously wounded him and caused permanent damage. (*Id*. at 5.) Additionally, plaintiff alleges that he remains on disability leave and suffers substantial pain, injury, economic distress, and family trauma. Plaintiff alleges defendant Tanner received only administrative leave for shooting plaintiff. Further, plaintiff's pension claim has not yet been decided by the pension board. (*Id.* at 6-7.)

Green brings this action for relief under 42 U.S.C. § 1983, with subject matter jurisdiction granted by 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (to redress federal constitutional violation), and under Missouri law with subject matter jurisdiction granted by 28 U.S.C. § 1367. Plaintiff Green alleges the following claims:

(1) Unreasonable seizure in violation of the Fourth and Fourteenth Amendments against defendant Tanner under 42 U.S.C. § 1983 (Count 1);

(2) Use of excessive force in violation of the Fourth and Fourteenth Amendments against defendant Tanner under 42 U.S.C. § 1983 (Count 2);

(3) Engaging in customs of unreasonable seizures, excessive force, and failure to train and supervise, a *Monell* claim under 42 U.S.C. § 1983 against defendant City (Count 3);

(4) Battery under Missouri law against both defendants (Count 4); and,

(5) Negligent infliction of emotional distress under Missouri law against both defendants (Count 5);

(Doc. 1.)

**<u>DEFENDANTS' JOINT MOTION TO DISMISS</u>**

Defendants City and Tanner have moved to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6) a party may move to dismiss all or part of a complaint for failure to state a claim. Fed. R. Civ. Pro. 12(b)(6). To overcome a motion to dismiss under Rule 12(b)(6) a complaint

"must include enough facts to state a claim to relief that is plausible on its face," providing more than just labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Such a complaint will "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will state a claim for relief that rises above mere speculation. *Twombly,* 550 U.S. at 555.

In reviewing the pleadings under this standard, the Court must accept all the plaintiff's factual allegations as true and draw all inferences in the plaintiff's favor, but the Court is not required to accept the legal conclusions the plaintiff draws from the facts alleged. *Retro Television Network, Inc. v. Luken Communications, LLC,* 696 F.3d 766, 768-69 (8th Cir. 2012). Additionally, the Court "is not required to divine the litigant's intent and create claims that are not clearly raised, . . . and it need not conjure up unpled allegations to save a complaint." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (en banc).

**Counts 1 and 2 against defendant Tanner**

In Counts 1 and 2 plaintiff Green alleges his constitutional rights were violated by defendant Tanner's allegedly unlawful seizure and use of excessive force by shooting him. Both these claims are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Determining whether the force used during seizure is "reasonable" requires a careful balancing of the individual's Fourth Amendment interests against the government's interests to determine whether the totality of the circumstances justifies the particular sort of seizure. *See id.* at 396. The "reasonableness" inquiry in an excessive force case is an objective one, in light of the facts and circumstances confronting an officer, without regard to the officer's underlying intent or motivations. *See Scott v. United States,* 436 U.S. 128, 137–39 (1978) ; *see also Terry v. Ohio,* 392 U.S. 1, 21 (1968).

In their memorandum supporting the motion to dismiss, defendants state that "Tanner fired one shot which struck Plaintiff in the arm while Plaintiff was holding a gun and walking toward another police officer involved in the pursuit." (Doc. 23 at 1.)

Defendant Tanner argues he is entitled to qualified immunity for the claims in Counts 1 and 2. Qualified immunity shields government officials from liability in an action brought under 42 U.S.C. § 1983, unless the alleged conduct violates a clearly established right of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Mullenix*

*v. Luna*, 136 S. Ct. 305, 308 (2015) (ruling the primary issue is whether the unconstitutional nature of the defendant's conduct was clearly established). Tanner argues it was not clearly established that he violated Green's rights by shooting him under the facts alleged in the complaint, citing *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). Plaintiff argues that *Kisela* is inapposite and the Court agrees. In that case:

> Petitioner Andrew Kisela, a police officer in Tucson, Arizona, shot respondent Amy Hughes. Kisela and two other officers had arrived on the scene after hearing a police radio report that a woman was engaging in erratic behavior with a knife. They had been there but a few minutes, perhaps just a minute. When Kisela fired, Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so. The question is whether at the time of the shooting Kisela's actions violated clearly established law.

138 S. Ct. at 1150. The circumstances of that case also involved the three responding officers telling Hughes twice to drop the knife, which she did not acknowledge, and the officers believed she was a threat to the other woman. *Id.* The district court ruled the issue of qualified immunity on a motion for summary judgment. Plaintiff's complaint alleges that Officer Tanner shot plaintiff at the same time he told him to drop his gun, not giving plaintiff an opportunity to comply. In *Kisela*, the Supreme Court acknowledged several cases in which there were circumstances that supported the denial of qualified immunity, *e.g.*, the subject being "physically compliant and generally follow[ing] all the officers' instructions." *Id.* at 1154. Plaintiff's complaint alleges that plaintiff and Det. Carlson were conversing when Officer Tanner appeared, shouted to plaintiff to drop his weapon and simultaneously shot plaintiff.

Defendant also argues that *Malone v. Hinman*, 847 F.3d 949 (8th Cir. 2017), supports him. *Hinman* is inapposite for several reason. It was decided in the district court on a motion for summary judgment. Plaintiff, after taking a firearm from an acquaintance in attempt to quell a disturbance with a large crowd at 2:00 a.m. on a parking lot, was then shot by a responding officer as he ran toward the rest of the crowd holding the gun.

While the plaintiff here and plaintiff Malone were both holding a firearm, the circumstances of that fact differ substantially. Malone was running with the crowd. Plaintiff Green was standing still speaking with an officer who had already announced that plaintiff was an officer. And from plaintiff's allegations of Tanner's silence and the statement by Officer Carlson that he had told Tanner ("you") plaintiff was off duty and not to shoot. Assuming plaintiff's

allegations are true, that plaintiff Green was not engaged in criminal activity, was not fleeing the police, was compliant with Det. Carlson and was speaking with him, and was not posing a threat to anyone, they give support to plaintiff's argument that his right to not be shot by defendant Tanner under the alleged circumstances finds support in *Shannon v. Koehler*, 616 F.3d 855, 862-63 (8th Cir. 2010) (case involving plaintiff not suspected of committing a serious crime, not fleeing or resisting arrest, and posing little threat to police). *See also Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Burnikel v. Fong*, 886 F.3d 706, 709-10. (8th Cir. 2018).

To the Court's perception at this pleading stage, the allegations in plaintiff's complaint do not establish that defendant Tanner is entitled to qualified immunity.[1] The disposition of that argument must await the proffer of relevant evidence after discovery and further motion practice.

The motion to dismiss is denied as to Counts 1 and 2.

**Count 3 against defendant City**

Defendant City argues the Count 3 claim, also founded on 42 U.S.C. § 1983, must be dismissed because it cannot be held liable on the basis of *respondeat superior* and plaintiff fails to state a claim otherwise for municipal liability under *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978); and *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

To state a claim against a public entity under § 1983, plaintiff must allege facts that plausibly indicate that plaintiff suffered injury due to a continuing, widespread, persistent pattern of unconstitutional conduct by the entity's employees or officials, including deliberate indifference after notice of the misconduct. *Monell*, 436 U.S. at 694; *Ware v. Jackson City, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998); *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000).

A single instance or isolated instances of wrongdoing are not sufficient to constitute notice of a pattern of unconstitutional acts. *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987). Here, plaintiff's complaint alleges defendant Tanner's assertedly unconstitutional shooting of plaintiff was caused by "Defendant City's custom of using excessive force on law-abiding

[1] Defendant Tanner argues that plaintiff pleads no facts that he and plaintiff were acquainted, that Tanner heard plaintiff identify himself as a police officer, that Tanner knew or should have known that plaintiff was a police officer, or that "Tanner heard or saw any of the interactions between plaintiff and Det. Carlson." (Doc. 23 at 5.) This argument does not credit the allegations of what Det. Carlson's statements to other officers that plaintiff was an officer both before and after Tanner fired his shot.

citizens." (Doc. 1 at ¶ 83.) Further, plaintiff alleges "Defendant City had notice that its training and supervision was inadequate and likely to result in constitutional violations based on multiple incidents of officers unconstitutionally seizing and using excessive force on law-abiding citizens, as referenced above." (*Id.* at ¶ 84.) In support of both allegations, plaintiff references four lawsuits.

The first of the suits is *Taylor v. Isom*, Case No. 4:11 CV 1351, 2013 WL 1867106 (E. D. Mo. 2013). In that case, plaintiff Taylor sued the City of St. Louis, the Police Chief, and three City police officers because on September 28, 2010, they forcibly arrested a third person, and then from a group of 15 people forcibly arrested Taylor. Taylor alleged that during her arrest, her right humerus bone was broken. Plaintiff alleged excessive force was used in both arrests. After the District Court issued orders dismissing claims, with no finding of constitutional violation, the case was voluntarily dismissed with prejudice on July 2, 2013. The Memorandum and Order, cited by plaintiff, on motion of one defendant to dismiss for failure to state a claim, described that plaintiff's allegations and denied the defendant's arguments based on Eleventh Amendment immunity and qualified immunity, but sustained the defendant's arguments of official immunity on the state law claims of assault and battery, and denied that argument on the claims of false arrest and imprisonment. As stated, before any trial, plaintiff voluntarily dismissed the case with prejudice.

The second of the cited cases is *O'Rourke v. King*, Case No. 4:16 CV 1795, 2017 WL 1152120 (E. D. Mo. 2017). In *O'Rourke,* plaintiff alleged that on May 24, 2012, when he was engaged in a peaceful political protest, certain officers unlawfully assaulted him with pepper spray, shoved him to the ground, arrested him, and violently attacked him, then fabricated charges against him. The opinion plaintiff cites involved one of the claims (Count 8) for damages against the Police Chief and the Board of Police Commissioners, based on policies, customs, and usages of the defendants. The cardinal issue before the District Court was whether the Eleventh Amendment shielded the St. Louis Board of Police Commissioners from liability. The Court determined that the state of the law was that the Board was not an arm of the state and is not so protected. The motion to dismiss was denied on this issue.

The third case cited is *Templeton v. Dotson*, 4:14 CV 2019 in this Court. In that case six individuals sued the St. Louis City Chief of Police, the St. Louis County Chief of Police, and a Missouri Highway Patrol Director. Plaintiffs alleged that they had engaged in constitutionally protected First Amendment activity following the death of Michael Brown in August 2014, but

that their rights were violated by police officers under the defendants' command in many ways, including intimidation, pepper spray, being shot by less-than-lethal projectiles, and being sprayed by tear gas. Plaintiffs sought the issuance of injunctive relief to prevent future police actions. The illegal police activities are alleged to have occurred during November 24-30, 2014, in Ferguson and in downtown St. Louis. On December 11, 2014, the Court issued a temporary restraining order. On March 26, 2015, the parties settled the case by an agreement that established and prohibited certain police actions.

The fourth case cited by plaintiff is *Fletcher v. Tomlinson*, 895 F.3d 1010, 1017 (8th Cir. 2018). In that case in this District Court, by amended complaint, an individual plaintiff sued four St. Louis City police officers, related officials, and others. Plaintiff alleged he was brutally attacked and arrested by police officers on March 6, 2013. The officers saw defendant standing in a vacant lot and believed he could be carrying a firearm. He alleged he was jailed and denied medical attention for failing kidneys. The case went to trial on his claims against each of the four police officers. The jury found liability and substantial actual and punitive damages against two of the four officers, and no liability for the other two. The Court of Appeals affirmed the jury's verdicts.

Plaintiff argues, in opposition to City's argument, that these case references sufficiently indicate the existence of a custom or policy of the City that resulted in plaintiff's injury. The Court disagrees. None of the four cases cited by plaintiff have anything to do with a custom of officers shooting someone in a situation even remotely similar to the circumstances that plaintiff alleges. Further, only two of the cases, *Templeton* and *Fletcher*, actually determined that constitutional violations occurred. Also, the dates of the alleged incidents are remote in time from the date of plaintiff's injury.

Plaintiff argues he should be allowed to discover the existence of the required custom or policy, citing *Doe v. School District of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). To merit this opportunity, the appellate court stated, "At a minimum, a complaint must allege facts which would support the existence of an unconstitutional policy or custom." 340 F.3d at 614. Plaintiff has pled the existence of a custom or policy that led to Officer Tanner shooting plaintiff. The Court will deny the motion to dismiss Count 3, even though it has determined that the currently alleged examples of the incidents are legally insufficient to prove a custom or policy.

**Counts 4 and 5 against defendant City**

Defendant City argues the state law claims of battery and negligent infliction of emotional distress should be dismissed, because it is immune from them under Rev. Stat. Mo. §§ 537.600-537.610, and plaintiff has not pled an exception to this immunity as he is required to do. *Epps v. City of Pine Lawn*, 353 F.3d 588, 594 (8th 2003).

"Sovereign immunity is: 'A judicial doctrine which precludes bringing suit against the government without its consent. Founded on the ancient principle that 'the King can do no wrong,' it bars holding the government or its political subdivisions liable for the torts of its officers or agents unless such immunity is expressly waived by statute or by necessary inference from legislative enactment.'" *Metro. St. Louis Sewer District v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 921 (Mo. banc 2016). "Missouri courts have recognized the common law rule of sovereign immunity since 1821. The rule is that the state, by reason of its sovereign immunity, is immune from suit and cannot be sued in its own courts without its consent [or] a waiver by the state". *Id.* "Section 537.600 itself waives sovereign immunity only for injuries resulting from public employees' negligent operation of a motor vehicle in the course of employment and for injuries caused by dangerous conditions of the public entity's property. Section 537.610 [2] waives sovereign immunity in certain circumstances involving insurance coverage." *Id.*

Plaintiff's complaint alleges that City has waived its sovereign immunity by possessing self-insurance under Rev. Stat. Mo. § 537.610.1. More specifically, the complaint alleges

> Defendant City is self-insured by the Public Facilities Protection Corporation ("PFPC"). The 2017 Comprehensive Annual financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

(Doc. 1 at ¶ 91.) "Moreover, the PFPC was designed 'to insure the city against all claims.' Exh. 1, Correspondence from Julian Bush, City Counselor." (*Id.* at ¶ 92.) That document is attached to plaintiff Green's complaint and may be considered on the issue raised by defendant's motion to

---

[2] Section 537.610.1 provides in pertinent part: "Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section ***and in such amount and for such purposes provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state***." (emphasis added.)

dismiss. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")

Complaint Exhibit 1 is a letter, dated January 31, 2018, from the Hon. Julian L. Bush, City Counselor for the City of St. Louis, to the Hon. City Alderwoman Megan E. Green. It is as follows:

Dear Alderwoman Green:

> Michael Garvin has forwarded your email to him requesting insight concerning the City's self insurance fund, "something called a PFPC," the funds used for paying settlements, and the liability of the City for paying settlements, particularly those involving police misconduct. I will try to satisfy your inquiry concerning these very interesting matters.
>
> First, what is a PFPC? The Public Facilities Protection Corporation of City of St. Louis is a not for profit corporation incorporated on November 20, 1986. Its articles of incorporation state that the purpose of the corporation is "to implement a program which will assure the continuing provision of municipal and governmental services by various public facilities and functions in the St. Louis metropolitan area which facilities are placed in jeopardy by escalating costs and exposures to exceed fiscal abilities." PFPC's current by-laws provide that the board is self-perpetuating, but they also provide that the Mayor, the President of the Board of Aldermen, the Comptroller, the Budget Director, and the City Counselor of the City of St. Louis or their respective designees are the directors. On September 16, 1987, the City's Board of Estimate and Apportionment adopted a resolution approving the "City of St. Louis Risk Management Program." Among many other things, the program imposed a duty on the City to annually appropriate funds into a "Risk Trust Fund" to be administered by PFPC, which was made responsible for administering that fund and payment of all claims, given its purpose to "insure the City against all claims."
>
> It is my understanding that over the years PFPC has, just as the September 16, 1987 plan approved by the Board of Estimate and Apportionment provided, paid claims against the City for damages. In addition to paying claims against the City, it has paid claims against City employees, other public employees, and also claims against other public corporations and not for profit corporations. It has also contracted with lawyers, has entered into contracts with the circuit court to provide "liability coverage," and it has entered into contracts with other public corporations to provide workers compensation insurance. It is my further understanding that each year the city's budget ordinance contains two line-item in the Law Department's budget styled "PFPC Contribution," one under the heading "City Counselor," and the other under the heading "City Counselor- Police Unit." During the fiscal year, and from time to time, the Comptroller issues warrants on those two accounts for the sums of money appropriated (this year $2,000,000 in the general line-item and $1,000,000 in the police unit line item), and the treasurer transfers those sums to PFPC. PFPC uses the sums so transferred to pay judgments against the City and its employees generally, including those arising from the operations

of the Division of Police and from the operations of the old Saint Louis Metropolitan Police Department, to the extent that the latter are not paid out of the State Legal Expense Fund. In addition, I understand that from time to time the Comptroller transfers additional sums of money from various city budgets relating to workers compensation and for surety bond premiums and insurance, and PFPC also receives revenues from other public entities for which it provides workers compensation coverage. Another source of PFPC revenue are payments made by the State in fulfill its obligation to reimburse for payments made to satisfy judgments and settlements arising from the days when the now defunct St. Louis Metropolitan Police Department was the police force serving the City. And from time to time additional funds are transferred to PFPC from general city revenues, as the need arises. During the course of a budget year when settlements are reached and judgments are rendered against the City and City employees, the City Counselor requests that those settlements and judgments be paid by PFPC, and PFPC pays those settlements and judgments. In any event, the current Board of Directors of PFPC comprises Beth Seright, Paul Payne, Nancy Kistler, Todd Waelterman, and Tom Shepard, all city employees, and the current officers are Ms. Kistler, its president, Mr. Waelterman, its vice-president, Mr. Shepard, its secretary, and Mr. Payne, its treasurer.

Is the City self-insured? Self-insurance is [11] [t]he practice of setting aside a fund to meet losses instead of insuring against such through insurance. [11] Black's Law Dictionary, 5th ed. In 1979 Ordinance 57821, now codified as sections 4.12.030 and 4.12.040 of the City Code, was approved. Ordinance 57821 purports to adopt a self-insurance plan applicable to claims arising from motor vehicle accidents with motor vehicles operated by City employees and from the dangerous condition of property owned by the City. The self insurance plan that the ordinance adopts is not described, and the ordinance by its terms only applies to claims relating to motor vehicles and property, and not to the myriad other claims that might be and are brought against the City, and by its terms is limited to claims for $100,000 for a single occurrence and $50,000 for a single person. This ordinance states that it was adopted pursuant to section 537.610.1 RSMo, but the limits of liability provided in that statute have since been raised without a commensurate modification of the ordinance. So perhaps the ordinance ought to be revisited***. But, in any event, the appropriations made each year in the law department and other budgets directed at PFPC and workers compensation can be properly thought to be self - insurance.***

The first full fiscal year that the City's Division of Police operated as the successor to the St. Louis Metropolitan Police Department was the fiscal year that began July 1, 2014, which is known as FY15. I understand (I have obtained these figures from Beverly Fitzsimmons of the Comptroller's office)) that the sums that PFPC has paid out that fiscal year and the two subsequent fiscal years now complete generally and those arising from the police force activities specifically are the following. For FY 15: $1,806,766 for non-police activities, $125,983 for Division of Police activities, and $1,320,825 for St. Louis Metropolitan Police Department activities. For FY 16 $1,669,402 for non-police activities, $176,869

for Division of Police activities, and $816,914 for St. Louis Metropolitan Police Department activities. For FY 17, $1,691,954 for non-police activities, $807,302 for Division of Police activities, and $1,060,000 for St. Louis Metropolitan Police Department activities.

I hope that this responds adequately to your inquiry.

(Doc. 1-1) (emphasis added). To defendant's memorandum in support of the motion to dismiss is attached a copy of St. Louis City Ordinance 57821 . That document is as follows:

An ordinance approving and authorizing the City of St. Louis to adopt a self-insurance plan regarding sovereign immunity pursuant to Conference Committee Substitute for Senate Substitute for Senate Committee Substitute for House Substitute for House Bill No. 1650, 79th General Assembly, which relates to asserting claims against the state and its political subdivisions for Tortious Conduct, and setting a limit on settlements, awards, and judgments of $100,000.00 for all claims arising out of a single occurrence and a limit of $50,000.00 for any one person in a single accident or occurrence.

Section One. Pursuant to Conference Committee Substitute for Senate Substitute for Senate Committee Substitute for House Substitute for House Bill No. 1650, 79th General Assembly, Section 2.1, the City of St. Louis hereby adopts a self-insurance plan for the purposes of injuries directly resulting from the negligent acts or omissions by employees of the City of St. Louis arising out of the operation of motor vehicles within the course of their employment and injuries caused by the condition of property of the City of St. Louis if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the City of St. Louis within the course of his employment created the dangerous condition or the City of St. Louis had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Section Two. In the tort claims described in Section One, there shall be a limit on settlements, awards, and judgments of $100,000.00 for all claims arising out of a single occurrence and a limit of $50,000.00 for any one person in a single accident or occurrence.

(Doc. 23-1.)

City argues that the advisory letter from City Counselor Julian Bush to Alderwoman Megan Green does not establish self-insurance coverage for the City. In determining whether a legislative provision waived a Missouri political entity's sovereign immunity, the Court must strictly construe the provision and not imply a waiver "not explicitly created by the statute." *Metro. St. Louis Sewer Dist. V. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 921 (Mo. banc 2016).

In response to City's argument that the PFPC did not create self-insurance coverage, because such was not explicitly stated in a legislative enactment, plaintiff argues that it has pled sufficient information to warrant discovery and a more specific factual determination of whether the City is self-insured. The Court agrees. *Epps v. City of Pine Lawn*, 353 F.3d 588 (8th Cir. 2003), cited by City was decided by the district court upon a motion for summary judgment after sufficient discovery regarding the MOPERM policy was made. While the City Counselor's letter of advice to the Alderwoman is not a document that established a self-insurance plan involving the PFPC, plaintiff has shown that this Court has consistently held that pleading the PFPC involvement is sufficient to warrant denial of dismissal of a complaint on sovereign immunity grounds. *E.g., Fortenberry v. City of St. Louis*, 2019 WL 1242671 at *7 (E. D. Mo. 2019); *Aldridge v. City of St. Louis, Missouri*, 2019 WL 1695982 at * 13 (E. D. Mo. 2019); *Laney v. City of St. Louis, Missouri*, 2019 WL 2423308 at *7 (E. D. Mo. 2019); *Thomas v. City of St. Louis, Missouri*, 2019 WL 3037200 at *7 (E. D. Mo. 2019); *Newbold v. City of St. Louis, Missouri*, 2019 WL 3220405 at *8 (E. D. Mo. 2019).

The Court will deny the motion to dismiss Counts 4 and 5 against defendant City.

**<u>Counts 4 and 5 against defendant Tanner</u>**

Defendant Tanner argues he is protected by official immunity from the state law claims of battery and the negligent infliction of emotional distress, citing *Seiner v. Drenon*, 304 F.3d 810, 813 (8th Cir. 2002) (ruling under Missouri law that an officer performing a discretionary act "is protected by official immunity where he executes a warrant, draws and fires a weapon").

Generally, under Missouri law, a police officer is entitled to official immunity from suit when he acts in the course of his official duties and without malice. *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019).

> The purpose of this doctrine is to allow public officials to make judgments affecting the public safety and welfare without the fear of personal liability. This is because if an officer is to be put in fear of financial loss at every exercise of his official functions, the interest of the public will inevitably suffer.
>
> Indeed, courts and legal commentators have long agreed that society's compelling interest in vigorous and effective administration of public affairs requires that the law protect those individuals who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business. Therefore, when a public official asserts the

> affirmative defense of official immunity, [he] should be afforded such immunity so long as [he] was acting within the scope of [his] authority and without malice. Under the doctrine of official immunity, a public official is not liable to members of the public for negligence that is strictly related to the performance of discretionary duties.
>
> Courts applying the doctrine of official immunity must be cautious not to construe it too narrowly lest they frustrate the need for relieving public servants of the threat of burdensome litigation. There is, however, a narrow exception to the application of the official immunity doctrine--- i.e., when a public officer fails to perform a *ministerial* duty required of him by law, he may be personally liable for the damages caused. This narrow exception, therefore, focuses on the nature of a ministerial act.
>
> Generally, a ministerial act has long been defined as merely "clerical." And this Court has noted that a ministerial duty compels a task of such a routine and mundane nature that it is likely to be delegated to subordinate officials.

*Id.* at 190-91 (quoted Missouri Supreme Court case citations omitted) (cleaned up). The Supreme Court's reference to ministerial acts was included only for completeness of the quotation and not because it is relevant to this case.

In the case at bar, under plaintiff's allegations of what happened, which, at the pleading stage, the Court must consider to be true, defendant Tanner's discharging his firearm at plaintiff Green was a discretionary act, *Woods v. Ware, 471* S.W.3d 385, 392 (Mo. Ct. App. 2015) ("A discretionary act requires the exercise of reason and discretion in determining how an act should be done or what course of action should be pursued"), that was within the scope of his authority as a police officer. What is at issue is the official immunity's limitation that the shooting not have occurred with malice.

Plaintiff's allegations are legally sufficient to support a finding that defendant Tanner acted with malice. He shot him at the same instant he told plaintiff to drop his weapon, after Det. Carlson believed he had told Tanner "I told you he was off duty. I told you not to shoot." (Doc. 1 ¶¶ 34, 37.) After shooting plaintiff, the complaint alleges that Tanner stood silent, offering no aid or apology. (*Id.* at ¶ 38.) Instead of alleging "malice" in Count 4, plaintiff alleges that defendant Tanner shot him "intentionally . . . [and] subjected [him] to harmful and offensive contact." (Doc. 1 at ¶ 89.) These facts are sufficient to plead plausibly that defendant Tanner acted with malice.

Further, Tanner argues the negligent infliction of emotional distress claim should be dismissed because plaintiff alleges Tanner shot him "willfully and knowingly" and not negligently,

citing *Friday v. McClure*, 536 S.W.3d 235 (Mo Ct. App. 2017). In *Friday*, the Court of Appeals reversed a jury verdict-based judgment upon a negligence claim, because claimant admitted defendant killed the decedent by intentionally shooting her. 536 S.W.3d at 239-40. Defendant's argument is premature at the pleading stage where plaintiff may seek relief in the alternative. *See* Fed. R. Civ. Pro. 8(a)(3).

The motion to dismiss Counts 4 and 5 against defendant Tanner is denied.

**CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss the complaint (Doc. 22) **is denied.**

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 2, 2020.